## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**DOCKETED**

SEP 0 6 2001



| | |
|---|---|
| SZ INVESTMENTS, L.L.C., WILLIAM PATE, JEFFREY KLEIN, BRIAN BOORSTEIN, ROD DAMMEYER, DAVID ROSEN, and JEFFREY A. WELLEK REVOCABLE TRUST, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| PAUL PRAGER, BBI POWER CORPORATION, ROGER ALTMAN, AUSTIN BEUTNER, JOHN BIRK, MICHAEL JORDAN, CURTIS LANE, NEERAJ MITAL, DAVID PECKER, CHRISTOPHER RYAN, and PAUL YOVOVICH, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**JUDGE RONALD GUZMAN**

# 01C 6909

Case No.

**MAGISTRATE JUDGE LEVIN**

FILED-EDS 01 SEP -5 PM 4: 15 CLERK U.S. DISTRICT COURT

## COMPLAINT

Plaintiffs, SZ Investments, L.L.C., William Pate, Jeffrey Klein, Brian Boorstein, Rod Dammeyer, David Rosen, and Jeffrey A. Wellek Revocable Trust, by their attorneys, Jenner & Block, LLC, complain against the above-named defendants, as follows:

## PARTIES

1.      SZ Investments, L.L.C. ("SZI") is a Delaware limited liability company and private investment company with its primary place of business in Chicago, Illinois. William Pate, Jeffrey Klein, Brian Boorstein, Rod Dammeyer, and David Rosen are individuals who reside in Illinois. The Jeffrey A. Wellek Revocable Trust is a trust established in the State of Illinois. SZI, William Pate, Jeffrey Klein, Brian Boorstein, Rod Dammeyer, David Rosen, and the Jeffrey A. Wellek Revocable Trust are collectively referred to as "Plaintiffs" or the "EGI Plaintiffs."

2.      Paul Prager ("Prager") is, on information and belief, a resident of the State of New York.

|—|

3. BBI Power Corporation ("BBI") is a Delaware corporation with its primary place of business in Maryland. Prager is President and a shareholder of BBI and, prior to the investment transactions that are the subject of this Complaint, was the sole owner of BBI.

4. Roger Altman, Austin Beutner, John Birk, Michael Jordan, Curtis Lane, Neeraj Mital, David Pecker, Christopher Ryan, and Paul Yovovich (the "Evercore Defendants") are individuals, none of whom reside in Illinois.

## JURISDICTIONAL ALLEGATIONS

5. This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367. Count I alleges a claim under 15 U.S.C. § 78j(b) and all other claims arise out of a common nucleus of operative facts and are so related to Count I that they form part of the same case or controversy under Article III of the United States Constitution.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

7. BBI is an infrastructure development company specializing in the early stage development of projects involving power generation and water supply and wastewater treatment.

8. The EGI Plaintiffs are all associated with Equity Group Investments, L.L.C. ("EGI"), a private investment company located in Chicago, Illinois. Sam Zell is the Chairman of EGI and has an indirect interest in SZI. Each of the EGI Plaintiffs is a shareholder in BBI.

9. The Evercore Defendants are nine individuals associated with Evercore Capital Partners, Inc. ("Evercore Capital"). The Evercore Defendants are also shareholders in BBI.

10. In early 1999, BBI and Prager began soliciting the EGI Plaintiffs to invest in BBI. A principal purpose of the investment was to help BBI finance the development of a coal-fired power project in Andhra Pradesh, India (the "India Project"), but Prager emphasized that BBI was developing a diverse international portfolio of power generation and water supply and waste

treatment projects in which the EGI Plaintiffs would participate. At around the same time, BBI and Prager also began soliciting an investment from the Evercore Defendants.

## The Letter Agreement

11.     In March 1999, the EGI Plaintiffs (other than Plaintiff Jeffrey Klein) (hereinafter the "Letter Agreement Plaintiffs") entered into a Letter Agreement (the "Letter Agreement") with Prager, BBI, and the Evercore Defendants. (A copy of the Letter Agreement is attached as Exhibit A.) The primary purpose of the investment reflected in the Letter Agreement was to provide capital for BBI.

12.     Among other things, the Letter Agreement provided that each of the Letter Agreement Plaintiffs and the Evercore Defendants would purchase BBI preferred Series A stock and warrants. (Exhibit A.) The Letter Agreement provided that BBI would issue 1,000 shares of Series A preferred stock with a $1 million liquidation preference. It also provided that the warrants were exercisable to purchase shares of common stock representing an aggregate 15% equity interest in BBI or the India Project.

13.     The Letter Agreement further provided that dividends on the preferred stock shall accrue at an annual rate of 10% of the liquidation preference compounded quarterly.

14.     Because Prager's expertise and experience were crucial to the Letter Agreement Plaintiffs' decision to invest in BBI, the Letter Agreement provided that "as long as any of the Preferred Stock remains outstanding, Mr. Prager will remain an employee of BBI and Mr. Prager shall devote all or a substantial portion of his business time to BBI and the [India] Project." (Exhibit A at ¶ 5.)

15.     The Letter Agreement provided that "as long as at least 510 shares of the Preferred Stock remains outstanding, all equity investments of Mr. Prager relating to his business activities shall be made exclusively through BBI." (Exhibit A at ¶ 5.)

16.     The Letter Agreement provided that "as long as at least 510 shares of Preferred Stock remain outstanding, BBI shall not enter into any merger, consolidation . . . or dispose of, all or a material portion of its assets." (Exhibit A at ¶ 9(c).)

17.     The Letter Agreement also provided that "BBI and Mr. Prager shall permit a designated representative of the Investors to visit and inspect any of BBI's properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of BBI with officers and employees of BBI and with its independent certified public accountants." (Exhibit A at ¶ 9(e).) The Letter Agreement did not purport to require any individual investor to waive his or her right to inspect the books and records.

18.     Between March and September 1999, the Letter Agreement Plaintiffs and the Evercore Defendants invested in installments a total of $1,000,000 in BBI, as provided for in the Letter Agreement. The Letter Agreement Plaintiffs' portion of the $1,000,000 was $350,000; they received 350 shares of preferred stock and 35% of the Series A warrants. The Evercore Defendants invested $650,000 and received 650 shares of preferred stock and 65% of the Series A warrants.

### The Series B Investment

19.     In early 2000, Prager solicited additional investments from the Letter Agreement Plaintiffs and the Evercore Defendants for the purpose of funding BBI's working capital. On or about March 31, 2000, the parties to the Letter Agreement agreed to an amendment whereby the Letter Agreement Plaintiffs and the Evercore Defendants agreed to invest additional sums totaling $500,000 in exchange for Series B preferred stock and warrants. (A copy of relevant documentation is attached as Exhibit B.)

20.     The Letter Agreement Plaintiffs' portion of the Series B investment was $225,000. Pursuant to the terms of the investment, the Letter Agreement Plaintiffs were entitled to

receive 225 shares of Series B preferred stock. The Series B investors were also to receive additional warrants exercisable into another 7.5% of the common stock of BBI and dilution protection on their original Series A investment. The EGI Plaintiffs were to receive 45% of that 7.5% interest.

21.     Prager represented that BBI, through the Evercore Defendants, would provide the EGI Plaintiffs with stock certificates and warrants. However, the Letter Agreement Plaintiffs did not receive individual stock or warrant certificates or full documentation of the investments as promised.

### The CES Transaction

22.     In May 2000, Prager notified the Letter Agreement Plaintiffs and the Evercore Defendants that BBI was investigating the purchase of Continental Energy Services ("CES") from Montana Power Corporation. CES was an attractive acquisition target because it had minority equity interests in a series of profitable domestic power projects.

23.     Prager informed the EGI Plaintiffs that CES was being auctioned by its parent Montana Power through its investment banker Goldman Sachs & Co. ("Goldman Sachs").

24.     In order for BBI to pursue CES, BBI needed financing commitments from outside investors. BBI and Prager approached several potential investors, including both SZI and Evercore Capital.

### The Series C Investment

25.     In July 2000, during the same time period in which Prager and BBI were seeking financing for the CES acquisition, Prager announced to both the EGI Plaintiffs and the Evercore Defendants that BBI again needed an additional $500,000 in short term financing to continue to operate.

26.     Prager represented to the EGI Plaintiffs that BBI would be using the $500,000 to fund BBI's business through January 2001. At the time that Prager made these representations,

he did not inform the EGI Plaintiffs that he also intended to use all or a portion of the EGI Plaintiffs' investments for the purpose of diverting the CES acquisition away from BBI.

27.     On July 21, 2001, Prager represented to the EGI Plaintiffs that he was in detailed discussions to sell a strategic equity interest in the India Project, that BBI had "every reason to count on success" but that he needed $500,000 "worst case to take me through [India Project] close."

28.     On July 24, 2001, Prager represented to the EGI Plaintiffs "BBI and our [India] Project are winners" and "the [India] Project will pay and substantially" but that he needed financial help "to keep the lights on."

29.     In reliance on Prager's representations concerning the progress of the India Project, the status of other ongoing BBI projects, as well as the prospects for the CES acquisition, the EGI Plaintiffs (now including Plaintiff Jeffrey Klein) and the Evercore Defendants agreed to purchase a third series (Series C) of preferred stock and warrants. The EGI Plaintiffs' portion of the Series C investment was $325,000. Pursuant to the terms of this financing, the EGI Plaintiffs were entitled to receive 325 shares of preferred stock and a liquidation preference of $650,000. The investors in the Series C financing were also entitled to receive warrants exercisable into another 7.5% of the common stock of BBI and, if not redeemed prior to September 1, 2001, into 10% of the common stock of BBI. The EGI Plaintiffs were entitled to receive 65% of those warrants, bringing their total common stock equity interest, based on an exercise of their warrants, to approximately 15% of the common stock of BBI.

30.     Prager represented that BBI would provide the EGI Plaintiffs with stock certificates and warrants and appropriate documentation of their investment. Although the EGI Plaintiffs completed their purchase of the Series C stock and warrants, they have never received their individual stock and warrant certificates as promised. On September 15, 2000, after all the EGI

Plaintiffs, other than SZI, had funded their Series C investment, a draft second amendment to the Letter Agreement, attached hereto and incorporated herein as Exhibit C, was circulated but not executed.

31.     On information and belief, Prager subsequently used all or a portion of the EGI Plaintiffs' investment to fund his individual participation in, and/or his expenses in negotiating, the misappropriation of BBI's right to purchase CES and has effectively abandoned any effort to make the India Project succeed.

### BBI's Participation In The Auction for CES

32.     At or about the time of the Series C investment, Prager began meeting with representatives of EGI to negotiate the terms of its financing of the CES acquisition.

33.     Prager represented to SZI that its participation in the CES financing was particularly significant because of the reputation and experience of Sam Zell and SZI's close relationship with Goldman Sachs. EGI Plaintiff William Pate had introduced Prager to the Goldman Sachs investment banker who handles the EGI relationship and arranged a meeting between Prager and Goldman Sachs to discuss CES and EGI's affiliation with Prager.

34.     In late August and early September 2000, Prager met several times with SZI representatives, including Sam Zell, to discuss financing the CES acquisition.

35.     SZI and Prager first agreed that Prager could represent to Goldman Sachs that Mr. Zell and SZI had committed to finance the first $5 million in the investment and also had agreed to lend Prager $5 million on a non-recourse basis for him to invest. This first $10 million was critical development funding that provided BBI with financial credibility in the CES auction process and allowed BBI to attract other investors. Having a commitment from SZI was especially valuable to Prager because of Mr. Zell's credibility as an investor. SZI's involvement with Prager legitimized BBI's bid for CES.

36.     SZI and Prager also began negotiating the terms of a "Continental Energy Services, Inc. Purchaser Term Sheet." (A copy of the draft "Term Sheet" which was forwarded to Prager is attached as Exhibit D.)

37.     In essence, the Term Sheet described a partnership between Prager and SZI, in which SZI would invest $10 million and consider investing up to $20 million of the passive investor funds necessary for reaching the approximate $85 million purchase price for CES, in exchange for a controlling equity stake in a new entity that would be merged with BBI, based on the consent of interested parties.

38.     On or about September 12, 2000, Prager submitted to SZI a draft CES acquisition letter for SZI's review. That letter stated, among other things that:

> **BBI has sufficient cash and available facilities to pay the Purchase Price and to make all other necessary payments of fees and expenses in connection with this transaction. BBI's proposal does not contemplate any financing contingency.**

(A copy of the draft bid letter is attached as Exhibit E (emphasis supplied).)

39.     This representation was false and misleading. Even if SZI committed the full $30 million ($5 million for an active equity stake, $5 million loan to Prager, and $20 million passive investment), Prager still needed over $50 million of additional financing. After reviewing the draft bid letter, SZI contacted Prager and objected to his making a misrepresentation to a third party.

40.     Following a heated discussion between representatives of SZI and Prager, Prager agreed not to misrepresent BBI's financial wherewithal. As it turned out, however, that would not be the case.

41.     On or about September 12, 2000, Prager submitted to Goldman Sachs a bid for CES in the amount of $82,500,000. The bid letter was made on behalf of BBI and Prager identified himself and Sam Zell of EGI as persons Goldman Sachs should contact if they had any

questions concerning the bid. He falsely represented that BBI had sufficient cash and available facilities to pay the purchase price.

42. On September 21, 2000, Prager wrote to Mr. Zell to inform him that Montana Power had accepted a revised bid of $84,500,000 for CES. In that letter, Prager stated that:

> **Sam, I want you to know how very much I appreciate your personal support and advice in the weeks prior to *our* final bid and contract negotiations. As you know, I am not an M & A guy, I simply want to develop power projects and manage a company that does the same.**

(A copy of the September 21, 2000 letter is attached as Exhibit F (emphasis supplied).) Apparently, based on Prager's representation that EGI was a participant in BBI's acquisition of CES, Goldman Sachs congratulated EGI on the successful bid.

43. On September 25, 2000, at the urging of Prager, SZI purchased its interest in the Series C investment.

44. On or about October 2, 2000, Prager informed SZI that Prager was no longer interested in pursuing the CES transaction as described in the Term Sheet even though he had used the SZI financing commitment as a crucial element of BBI's bid. Prager informed SZI representatives that if they did not wish to be direct investors in BBI's acquisition of CES, they still would participate in CES through the EGI Plaintiffs' existing investments in BBI. Prager represented to SZI that he would not commit to a particular capital structure for the CES transaction without consultation and consent.

45. SZI did not immediately insist upon compensation for the value of its financing commitment or other services that Prager had used to make BBI's bid for CES. SZI relied upon Prager's representations that the EGI Plaintiffs, all of whom were associated with SZI, would retain a substantial interest in CES through their equity stakes in BBI and that no alternative capital structure would be put in place without consultation and consent.

### The Diversion of the CES Transaction

46.     In February 2001, however, BBI and Prager assigned the right to purchase CES to the CES Acquisition Corp. ("CESACQ"), a consortium of investors primarily comprised of Energy Spectrum Partners, one or more affiliates of Evercore Capital, and Prager individually.  In doing so, BBI and Prager deprived the EGI Plaintiffs of their anticipated participation in the CES acquisition through their stakes in BBI.

47.     The CESACQ transaction violated the Letter Agreement because the right to acquire CES was by far BBI's most valuable asset and, under paragraph 9(c) of the Letter Agreement, no material portion of BBI's assets could be disposed of while 510 shares of preferred stock remain outstanding.

48.     The Letter Agreement also provides that so long as the BBI preferred stock was outstanding, Prager would devote all or a substantial amount of time to BBI and the India Project.  (Exhibit A at ¶ 5.)  Since at least February 2001, Prager has been devoting all, or a substantial portion, of his time to operating CESACQ, notwithstanding that in excess of 510 shares of BBI preferred stock remain outstanding.  Prager has effectively abandoned BBI.

49.     Although more than 510 shares of BBI preferred stock remains outstanding, Prager has made substantial equity investments through other vehicles, including CESACQ.

50.     Under paragraph 4(b) of the Letter Agreement, the preferred stock is subject to a mandatory redemption by BBI in the event that BBI disposes of a material portion of its assets.  The amount of the mandatory liquidation preference is 200% of the $1 million liquidation preference for the first 1,000 shares, plus any accrued and unpaid dividends, and, an additional 100% of the aggregate liquidation preference as to all shares over the first 1,000 shares, plus any accrued and unpaid dividends.

51.     The CESACQ transaction constitutes a disposition of a material portion of BBI's assets within the meaning of paragraph 4(b) of the Letter Agreement. Without limitation as to remedy, the Letter Agreement Plaintiffs are entitled to a mandatory redemption in an amount in excess of $1,200,000.

52.     The Evercore Defendants were participating in CESACQ, either directly or through Evercore Capital. Thus, even if they thought they had authority to represent the Letter Agreement Plaintiffs, the Evercore Defendants had conflicting loyalties that precluded them from adequately representing the interests of the Letter Agreement Plaintiffs in connection with the assignment by BBI of the right to own CES. Additionally, the CESACQ transaction violates paragraph 9(c) of the Letter Agreement, which prohibits a disposition of any material portion of BBI's assets, without regard to whether the Evercore Defendants purported to authorize the transfer.

### The Freeze-Out of the EGI Plaintiffs

53.     Since March 2001, the EGI Plaintiffs have been trying to learn the terms of the CESACQ transaction in order to assess the impact on their substantial investments in BBI. (A copy of a March 16, 2001 letter is attached as Exhibit G.)

54.     Prager, BBI, and the Evercore Defendants repeatedly have refused to provide material information regarding the terms of the transaction.

55.     Prager and the Evercore Defendants have implemented a plan to cut the EGI Plaintiffs out of BBI and CESACQ entirely. In April 2001, Prager and the Evercore Defendants proposed that they and the EGI Plaintiffs exercise their rights under the Letter Agreement to an optional redemption of their BBI investments, pursuant to which the EGI Plaintiffs would have received the right to a portion of any recovery from litigation arising out of the stalled India Project and forfeit their right to participate in CESACQ.

56.     If the EGI Plaintiffs had redeemed their BBI investments, as Prager and the Evercore Defendants recommended, they would have been deprived of their investment in CESACQ through BBI.  They also may have forfeited their right to review the terms of the CESACQ transaction in order to assess the impact of the transaction on their substantial investments in BBI.

57.     Although the EGI Plaintiffs rejected the Evercore Defendants' optional redemption proposal, Prager and the Evercore Defendants have refused to provide the EGI Plaintiffs with information concerning BBI and have refused to answer inquiries.

58.     In May 2001, the EGI Plaintiffs, through EGI, asked the Evercore Defendants to provide the following information:

> A.     All appropriate documentation for the investments made to date in BBI.  This would include certificates for all outstanding preferred stock and warrants;
>
> B.     Financial statements for BBI from inception to date; and
>
> C.     A complete set of the CES transaction documents.

(A copy of the May 23, 2001 letter is attached as Exhibit H.)

59.     The Evercore Defendants, BBI, and Prager responded to this request by: (1) refusing to produce material information concerning the CESACQ transaction, explaining that "BBI does not understand why [the EGI Plaintiffs are] entitled to such information"; (2) representing that the EGI Plaintiffs would receive appropriate documentation of their stock and warrant purchases; and (3) agreeing to prepare financial statements for BBI.  (A copy of BBI's May 25, 2001 memorandum is attached as Exhibit I.)

60.     Up to the date of the filing of this lawsuit, the EGI Plaintiffs have repeatedly requested this information and have been categorically denied the information by BBI, Prager and the Evercore Defendants.  To date, BBI has failed to provide either financial statements or

documentation of the EGI Plaintiffs' Series B and C stock and warrant purchases – despite its representation over two months ago that it would do so. (See Exhibit I.)

61.     Because of BBI's, the Evercore Defendants' and Prager's refusal to provide information to the EGI Plaintiffs, the EGI Plaintiffs have been deprived of information regarding BBI's activities and investment in CESACQ to which they are entitled.

## COUNT I
### (15 U.S.C. § 78j(b) and Rule 10b-5)
### (EGI Plaintiffs against Paul Prager)

62.     Plaintiffs repeat and reallege and incorporate by reference as though fully set forth herein paragraphs 1 through 61 of the Complaint.

63.     Prager represented to the EGI Plaintiffs the material fact that funds used to purchase Series C preferred stock and warrants in BBI would be used to invest in projects to benefit the shareholders of BBI.

64.     On July 21, 2001, Prager represented to the EGI Plaintiffs that he was in detailed discussions to sell a strategic equity interest in the India Project, that BBI had "every reason to count on success" but that he needed $500,000 "worst case to take me through [India Project] close."

65.     On July 24, 2001, Prager represented to the EGI Plaintiffs "BBI and our [India] Project are winners" and "the [India] Project will pay and substantially."

66.     On or about August 2, 2000, Prager again represented through a representative to the EGI Plaintiffs that BBI needed an additional $500,000 of equity capital to fund BBI's business through January 2001.

67.     The representations set forth in paragraphs 63 to 66 were false and misleading. At the time Prager made these representations, there was no factual basis to represent that the India Project was a "winner" or likely to pay substantially and, on information and belief, he intended to

-13-

use all or a portion of the investments to pursue his own interests in the CES transaction and divert the CES transaction away from BBI.

68.     On or about September 18, 2000, Prager represented to the EGI Plaintiffs that because SZI would provide the money to finance the acquisition of CES, it would have a controlling interest in CES, and that BBI would receive a non-controlling interest in CES with certain managerial responsibilities upon financial close. Those representations were false and misleading. On information and belief, at the time Prager made those representations, he did not intend to give SZI a controlling interest in CES and intended for BBI to sell the right to purchase CES to CESACQ.

69.     On or about September 21, 2000, Prager represented to the EGI Plaintiffs that, with regard to the acquisition of CES, "we have 'it' in the corral." That representation was false and misleading. On information and belief, at the time Prager made that representation, he did not intend to include SZI in the acquisition of CES on the terms that had been discussed and did not intend to include BBI in the transaction.

70.     In mid-August 2000, the EGI Plaintiffs other than SZI purchased Series C preferred stock in the amount of $187,500 and thereafter maintained their ownership of that stock in reliance on Prager's representations.

71.     On or about September 25, 2000, SZI purchased Series C preferred stock in the amount of $137,500 and thereafter maintained its ownership of that stock in reliance on Prager's representations.

72.     Prager's material misrepresentations were made in connection with the purchase and sale of Series C preferred stock in BBI.

73.     In reliance on Prager's misrepresentations, the EGI Plaintiffs purchased and continued their ownership of Series C preferred stock.

-14-

74. Prager used the funds provided by the sale of Series C preferred stock to purchase CES for the benefit of himself and CESACQ and not for the benefit of BBI and its shareholders.

75. The EGI Plaintiffs have suffered the loss of all or a portion of their original investment funds in Series C preferred stock, and have suffered diminution in the value of their stake in BBI.

## COUNT II
### (Breach of Fiduciary Duty and Misappropriation of Corporate Opportunity)
### (EGI Plaintiffs Individually and on behalf of BBI against Paul Prager)

76. Plaintiffs repeat and reallege and incorporate by reference as though fully set forth herein the allegations contained in paragraphs 1 through 75 of the Complaint. Plaintiffs bring Count II individually and as a derivative claim on behalf of BBI.

77. Prager, as an officer of BBI, owes fiduciary duties of good faith, due care, fairness, and loyalty to BBI and its shareholders.

78. The EGI Plaintiffs, at all relevant times, have been and continue to be shareholders in BBI.

79. BBI had a tangible expectation of acquiring CES as a corporate investment opportunity.

80. Prager intentionally and in bad faith diverted and misappropriated the acquisition of CES away from BBI by assigning the right to acquire CES to CESACQ, an entity in which Prager and the Evercore Defendants have an independent interest, without BBI receiving full value.

81. The diversion of the CES acquisition opportunity was a breach of Prager's fiduciary duties to BBI and its shareholders.

82.     The Evercore Defendants facilitated this breach of fiduciary duty by purporting to authorize this transaction.

83.     The EGI Plaintiffs have not demanded that BBI pursue the misappropriated corporate opportunity or take action to remedy breaches of fiduciary duty because to do so would be futile. BBI has effectively been controlled by Prager and the Evercore Defendants, both of whom are principals in CESACQ.

84.     BBI and the EGI Plaintiffs were injured by Prager's misappropriation of this corporate opportunity. BBI and/or the EGI Plaintiffs are entitled, without limitation as to remedy, to a constructive trust over Prager's interest in CES.

85.     Prager's misappropriation of the CES opportunity and breaches of fiduciary duty have been malicious, willful and wanton.

### COUNT III
### (Breach of Fiduciary Duty)
### (EGI Plaintiffs against Paul Prager and Evercore Defendants)

86.     Plaintiffs repeat and reallege and incorporate by reference as though fully set forth herein the allegations contained in paragraphs 1 through 85 of the Complaint.

87.     Prager breached the fiduciary duties he owed to the EGI Plaintiffs individually when he diverted the CES opportunity to an entity in which he had an interest, refused to provide relevant information about the CESACQ transaction to the EGI Plaintiffs and refused to provide any further information about the transaction or financial information regarding BBI.

88.     The Evercore Defendants facilitated the diversion of the CES opportunity to a separate company in which they had an interest by participating directly in and purporting to authorize the transaction.

89.     The Evercore Defendants, as controlling preferred shareholders with respect to certain decisions related to BBI, owe fiduciary duties of good faith, due care, loyalty, and fairness to the EGI Plaintiffs.

90.     The Evercore Defendants' purported authorization of and participation in the diversion of the CES opportunity, their refusal to provide information concerning the CES acquisition and their refusal to provide the EGI Plaintiffs access to BBI's books and records constituted breaches of the Evercore Defendants' fiduciary duties. The Evercore Defendants were fully informed of the terms of the transaction and BBI's financial status by virtue of their affiliation with Evercore Capital.

91.     The EGI Plaintiffs have been injured by Prager and the Evercore Defendants' breaches of fiduciary duty because, among other things, they were deprived of their interest in the CES opportunity and of information necessary to assess the present value of their investments in BBI, including BBI's interest in the CES transaction.

92.     Prager and the Evercore Defendants' breaches of fiduciary duty have been intentional, malicious, willful and wanton.

### COUNT IV
### (Intentional Misrepresentation)
### (EGI Plaintiffs against Paul Prager)

93.     Plaintiffs repeat and reallege and incorporate by reference as though fully set forth herein the allegations contained in paragraphs 1 through 92 of the Complaint.

94.     Prager knew the representations set forth in paragraphs 63 to 66 and 68 and 69 were false when they were made, but he made them for the purpose of inducing the EGI Plaintiffs to rely on his statements in making and maintaining their additional investments in BBI.

95.     In reliance on Prager's misrepresentations, the EGI Plaintiffs purchased the Series C stock and warrants and did not take steps to enforce their right to participate in the CES acquisition through BBI.

96.     The EGI Plaintiffs were injured as a direct and foreseeable consequence of Prager's misrepresentations.

97.     Prager's misrepresentations to the EGI Plaintiffs were malicious, willful and wanton.

### COUNT V
### (Breach of Contract)
### (Letter Agreement Plaintiffs against Paul Prager)

98.     The Letter Agreement Plaintiffs repeat and reallege and incorporate by reference as though fully set forth herein the allegations contained in paragraphs 1 through 97 of the Complaint.

99.     The Letter Agreement Plaintiffs and Prager are parties to the Letter Agreement, a valid and enforceable contract.

100.    The Letter Agreement Plaintiffs have fully performed their obligations under the Letter Agreement.

101.    Prager breached the Letter Agreement by causing BBI to dispose of a material portion of BBI's assets even though 510 shares of BBI preferred stock were outstanding.

102.    Prager breached the Letter Agreement by failing to devote all or a substantial portion of his time to BBI and the India Project even though 510 shares of BBI preferred stock remains outstanding.

103.    Prager breached the Letter Agreement by making equity investments through entities other than BBI even though more than 510 shares of BBI preferred stock are outstanding.

104.     The Letter Agreement Plaintiffs have been injured as a direct and foreseeable consequence of Prager's breaches of contract.

### COUNT VI
### (Breach of Contract)
### (Letter Agreement Plaintiffs against BBI)

105.     The Letter Agreement Plaintiffs repeat and reallege and incorporate by reference as though fully set forth herein the allegations contained in paragraphs 1 through 104 of the Complaint.

106.     BBI is a party to the Letter Agreement.

107.     The Letter Agreement Plaintiffs have fully performed their obligations under the Letter Agreement.

108.     BBI has breached the Letter Agreement by failing to make mandatory redemption of the Letter Agreement Plaintiff's liquidation preference as provided for in paragraph 4(b) of the Letter Agreement.

109.     The Letter Agreement Plaintiffs have been injured as a direct and foreseeable consequence of Prager's breach of the Letter Agreement. Without limitation as to remedy for BBI's breach of contract, the Letter Agreement Plaintiffs are entitled to over $1.2 million under paragraph 4(b) of the Letter Agreement.

### COUNT VII
### (Unjust Enrichment)
### (SZI against Paul Prager)

110.     Plaintiffs repeat and reallege and incorporate by reference as though fully set forth herein the allegations contained in paragraphs 1 through 109 of the Complaint.

111.     SZI bestowed a benefit on Prager in the form of SZI's commitment to provide the first $10 million of financing for the CES acquisition. SZI's commitment was also extremely

valuable to Prager because it legitimized and validated BBI's bid in the eyes of Montana Power and Goldman Sachs, the CES auction manager.

112.    Prager obtained the benefit of SZI's commitment and services without adequately compensating SZI.

113.    Equity and good conscience require that Prager compensate and/or make restitution to SZI.

114.    SZI suffered damages as a result of Prager's unjust enrichment in that it did not receive compensation for Prager's use of its name and financing commitment and in that it lost its right to acquire an interest in CES and profit from its considerable investments in BBI and the CES acquisition.

**COUNT VIII**
**(Denial of Access to Books and Records)**
**(EGI Plaintiffs against BBI, Prager and Evercore)**

115.    Plaintiffs repeat and reallege and incorporate by reference as though fully set forth herein the allegations contained in paragraphs 1 through 114 of the Complaint.

116.    As individual shareholders of BBI, the EGI Plaintiffs have a statutory right to access the books and records of BBI.

117.    Pursuant to paragraph 9(e) of the Letter Agreement, the Letter Agreement Plaintiffs also have a contractual right to "inspect and examine and make abstracts of any of [BBI's] books and records at any reasonable time and as often as may reasonably be desired."

118.    The EGI Plaintiffs have repeatedly requested access to BBI's books and records in order to evaluate transactions effecting its shareholder interests in BBI.

119.    Prager, BBI, and the Evercore Defendants repeatedly have refused the EGI Plaintiffs' requests for access to BBI's corporate books and records.

-20-

120. BBI's refusal to permit access to BBI's books and records constitutes an explicit breach of paragraph 9(e) of the Letter Agreement (as to the Letter Agreement Plaintiffs) and a violation of Section 624 of the New York Business Corporations Code (as to the EGI Plaintiffs).

121. The EGI Plaintiffs have been injured by Prager, the Evercore Defendants and BBI's refusal to permit access by virtue of the fact that they are unable to assess the value of their investments in BBI.

## COUNT IX
### (Breach of Contract)
### (Letter Agreement Plaintiffs against Evercore Defendants)

122. The Letter Agreement Plaintiffs repeat and reallege and incorporate by reference as though fully set forth herein the allegations contained in paragraphs 1 through 121 of the Complaint.

123. The Evercore Defendants are parties to the Letter Agreement.

124. Pursuant to the Letter Agreement, the Evercore Defendants are designated as the "primary point of contact" for interactions between BBI and BBI's investors, including the Letter Agreement Plaintiffs.

125. As the primary point of contact for investors, the Evercore Defendants have a contractual obligation to obtain information from BBI for BBI's investors. The Evercore Defendants did not perform that obligation and have used their designation as the primary point of contact to prevent, rather than facilitate, access to BBI's records by the Letter Agreement Plaintiffs.

126. The Evercore Defendants' conduct constitutes a breach of the Letter Agreement.

127. The Letter Agreement Plaintiffs have been damaged by the Evercore Defendants' breach in that the Letter Agreement Plaintiffs cannot assess the value of their stake in BBI.

## DEMAND FOR JURY

Plaintiffs demand a jury.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.    Enter an Order awarding Plaintiffs compensatory damages in an amount to be determined at trial;

B.    Enter an Order awarding Plaintiffs punitive damages in an amount to be determined at trial;

C.    Enter an Order requiring Prager to make restitution to Plaintiffs in an amount to be determined at trial;

D.    Enter an Order granting Plaintiffs access to the corporate books and records of BBI, including, but not limited to, the CESACQ acquisition documents;  and

E.    Enter an Order imposing a constructive trust in favor of BBI and/or Plaintiffs over Prager's ownership interest in CESACQ;

F.    Enter an Order granting any other further relief that is just and proper.

Respectfully submitted,

SZ INVESTMENTS, L.L.C., WILLIAM PATE, JEFFREY KLEIN, BRIAN BOORSTEIN, ROD DAMMEYER, DAVID ROSEN, and JEFFREY A. WELLEK REVOCABLE TRUST

Dated:  September 5, 2001

By: _____
One of Their Attorneys

David J. Bradford
Benjamin C. Weinberg
Erin R. Schrantz
JENNER & BLOCK, LLC
One IBM Plaza
Chicago, Illinois  60611
(312) 222-9350

# EXHIBIT  A

EXECUTION COPY

March 30, 1999

Re: BBI Power Corporation

Mr. Paul Prager

BBI Power Corporation
Manor House
208 Pier One Road
Stevensville, MD 21666

Dear Mr. Prager:

The undersigned individuals (collectively, the "Investors") hereby subscribe and have agreed, in accordance with the terms and subject to the conditions of this letter agreement (the "Letter Agreement"), to purchase from BBI Power Corporation ("BBI"), and BBI agrees to issue and sell to the Investors, an aggregate of 1,000 of shares of Series A preferred stock, par value $.01 per share (the "Preferred Stock"), of BBI with an aggregate liquidation preference of $1 million and 176.5 warrants to purchase shares of common stock exercisable into an aggregate 15% fully diluted equity interest in BBI or the Project (as defined below), as set forth in Section 6 (the "Warrants").

Mr. Paul Prager               -2-                         March 30, 1999

Individuals associated with Evercore Group shall act as the primary point of contact for interactions between BBI and the Investors. However, such individuals will not incur any liability as a result of such association or contacts.

Each Investor, severally and not jointly, and BBI and Paul Prager hereby agree as follows:

1.    The Preferred Stock. The aggregate purchase price for the Preferred Stock and the Warrants shall be $1,000,000, with each individual Investor's proportionate share being determined by the amount of such Investor's commitment as set forth in Schedule 1. The Preferred Stock and the Warrants shall be purchased in three installments, on 5 business days' written notice from BBI to the Investors, subject to the following maximum aggregate purchase price for each installment:

| | |
|---|---|
| Upon execution of this Letter Agreement: | $600,000 |
| Three Month Anniversary of the date of this Letter Agreement: | $200,000 |
| Six Month Anniversary of the date of this Letter Agreement: | $200,000 |

2.    Conditions Precedent. It is a condition precedent to the obligation of the Investors to purchase the Preferred Stock and the Warrants that BBI and Mr. Prager duly execute and deliver this Letter Agreement, and that BBI duly execute and deliver certificates of Preferred Stock (the "Preferred Stock Certificates") and the Warrant Certificates (as defined below) to the Investors. In addition, conditions precedent to the obligation of the Investors to purchase the second and third installments of Preferred Stock are (i) that there is no material adverse change in the business, financial condition, assets, liabilities or prospects of BBI or the Project (as defined below), (ii) that BBI is not insolvent and (iii) BBI shall not have redeemed any of the previously issued shares of Preferred Stock upon execution of any definitive agreement with any strategic investor.

In the event an Investor fails to purchase its pro rata share of either the second or third installment of Preferred Stock and the conditions to funding have been met, other Investors shall first be given the option

Mr. Paul Prager           -3-           March 30, 1999

to purchase those shares of Preferred Stock not purchased, and a pro rata share of Warrants held by the Investor shall be transferred to the Investors purchasing those shares, based on the amount so purchased relative to the defaulting Investor's aggregate funding commitment. However, in the event that those shares of Preferred Stock are not purchased, the defaulting Investor shall lose all of the Warrants issued to such defaulting Investor, in addition to all other remedies available to BBI at law or in equity.

3.     Dividends. Dividend on the Preferred Stock shall accrue at an annual rate of 10% of the liquidation preference of the Preferred Stock compounded quarterly. In the event that BBI does not execute any definitive agreement with any strategic investor for providing financing for the development of the 2 X 260 Krishnapatnam "B" Power Project (the "Project") within one year from the time the initial installment of Preferred Stock is purchased by the Investors (the "Initial Closing Date"), dividends shall accrue from the Initial Closing Date. However, in the event that BBI executes such a definitive agreement with any strategic investor within one year of the Initial Closing Date, dividends shall accrue from the first year anniversary of the Initial Closing Date.

Other than as set forth in Section 4 below, dividends accrued from the Initial Closing Date shall be payable, at the option of BBI, in cash or in kind.

4.     Redemption. (a) The Preferred Stock is, at the option of BBI, subject to redemption at any time for a cash amount equal to (1) in the case of the first 1,000 shares redeemed (including any shares redeemed pursuant to the mandatory redemption provisions), (x) 200% of the liquidation preference plus (y) any accrued and unpaid dividends, and (2) in the case of any shares in excess of 1,000 that are redeemed, (A) 100% of the aggregate liquidation preference per share plus (B) any accrued and unpaid dividends;

(b)     The Preferred Stock is subject to mandatory redemption by BBI in the event that BBI enters into any merger, consolidation, amalgamation or dissolves itself, or disposes of all or a material portion of its assets for a cash amount equal to (1) in the case of the first 1,000 shares redeemed, (x) 200% of the liquidation preference plus (y) any accrued and unpaid dividends, and (2) in the case of any

Mr. Paul Prager                    -4-                    March 30, 1999

shares in excess of 1,000 that are redeemed, (A) 100% of the aggregate liquidation preference per share plus (B) any accrued and unpaid dividends;

The Preferred Stock is also subject to mandatory redemption by BBI after the five year anniversary of the date of this Letter Agreement for a cash amount equal to (x) 100% of the liquidation preference plus (y) any accrued and unpaid dividends;

In addition, in the event that BBI executes a definitive agreement with a strategic investor for providing financing for the Project, the Preferred Stock is subject to mandatory redemption by BBI, provided that 50% of the outstanding Preferred Stock (but in no event more than 500 shares to be redeemed) shall be redeemed for a cash amount equal to (x) 200% of the aggregate liquidation preference per share plus (y) any accrued and unpaid dividends. Any other shares of Preferred Stock that may be redeemed at that time shall be redeemed for a cash amount equal to (A) 100% of the aggregate liquidation preference per share plus (B) any accrued and unpaid dividends;

Finally, at the time when all equity and debt commitments for the Project have been funded (the "Project Financial Close"), another 50% of the outstanding Preferred Stock shall be subject to mandatory redemption by BBI for a cash amount equal to (x) 200% of the aggregate liquidation preference per share plus (y) any accrued and unpaid dividends. Any remaining shares of outstanding Preferred Stock shall be redeemed for a cash amount equal to (A) 100% of the aggregate liquidation preference per share plus (B) any accrued and unpaid dividends; and

All shares of Preferred Stock shall be redeemed pro rata among the Investors unless otherwise agreed by all Investors.

(c)     The Warrants shall remain outstanding notwithstanding the full or partial redemption, repurchase or other cancellation of the Preferred Stock.

5.     Mr. Prager's Commitment. For as long as any of the Preferred Stock remains outstanding, Mr. Prager will remain an employee of BBI and Mr. Prager shall devote all or a substantial portion of his business

Mr. Paul Prager                          -5-                      March 30, 1999

time to BBI and the Project. In addition, for as long as at least 510 shares of the Preferred Stock remains outstanding, all equity investments of Mr. Prager relating to his business activities shall be made exclusively through BBI. Finally, Mr. Prager himself shall not invest or have a direct interest in any subsidiary of BBI.

6.      Warrants. The Warrants shall be allocated among the Investors pro rata in accordance with the Investors' respective commitments. BBI shall deliver warrant certificates in the form of Exhibit A (the "Warrant Certificates") to be executed on or prior to the Initial Closing Date. The exercise price for each Warrant is $.01. Alternatively, at the option of the Investors, the Warrants may be exchanged for up to 15% of BBI's carried interest in the Project. In such event, both parties shall take all necessary measures to reflect such exchange in appropriate documents.

7.      Representations and Warranties. Each of BBI and Paul Prager jointly and severally represents and warrants to the Investors as follows:

        (a)      Organization and Good Standing of BBI. BBI is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, operate and lease its properties and to carry on its businesses as they are now being conducted. The Certificate of Designation for the Preferred Stock, together with BBI's Certificate of Incorporation, Certificate of Amendment to the Certificate of Incorporation and a form of Preferred Stock certificate, is attached hereto as Exhibit B. BBI is duly licensed or qualified as a foreign corporation for the transaction of business and is in good standing under the laws of each other jurisdiction in which its ownership or leasing of properties, or the conduct of its businesses requires such licensing or qualification and good standing, except where the failure to be so licensed or qualified or in good standing in any such jurisdiction would not have a material adverse effect;

        (b)      Authorization; No Conflicts. BBI has full corporate power and authority to enter into this Letter Agreement and to execute the Preferred Stock Certificates and the Warrant Certificates and to perform its obligations hereunder and thereunder. The execution, delivery and performance by BBI of this Letter Agreement, the Preferred Stock Certificates and the Warrant Certificates and the consummation of BBI's obligations hereunder and thereunder have been duly authorized by all necessary corporate action. This

`Mr. Paul Prager                    -6-                    March 30, 1999

Letter Agreement has been, and on or prior to Initial Closing Date, the
Preferred Stock Certificates and the Warrant Certificates, to which they are
parties, shall be duly and validly executed and delivered by BBI and
Mr. Prager. This Letter Agreement constitutes, and upon its execution and
delivery the Preferred Stock Certificates and the Warrant Certificates, to
which they are parties, shall be a valid and legally binding obligation of BBI
and Mr. Prager enforceable against BBI and Mr. Prager in accordance with its
terms, except as enforceability may be limited by applicable bankruptcy,
insolvency, reorganization, moratorium or similar laws affecting creditors
generally and by general equitable principles. The execution, delivery and
performance of this Letter Agreement, the Preferred Stock Certificates and
the Warrant Certificates, to which they are parties, by BBI and Mr. Prager, the
consummation of the transactions by BBI and Mr. Prager contemplated
hereby and thereby and the compliance by BBI and Mr. Prager with the
provisions hereof and thereof will not conflict with, violate or result in a
breach of any provision of, require a consent, approval or notice under, or
constitute a default (or an event which, with notice or lapse of time or both,
would constitute a default) under, or result in the termination of or accelerate
the performance required by, or result in a right of termination or acceleration
under, or result in the creation of any lien upon any of the properties or assets
of BBI or Mr. Prager under, (i) the articles of incorporation, by-laws or other
governing instrument of BBI, (ii) any contractual obligation of BBI or
Mr. Prager or (iii) any requirement of law applicable to BBI;

(c)     Consents. No consent, approval, order or authorization of,
registration, declaration or filing with, or notice to, any governmental entity is
required on the part of BBI or Mr. Prager in connection with the execution
and delivery by BBI and Mr. Prager of this Letter Agreement, the Preferred
Stock Certificates and the Warrant Certificates, to which they are parties, the
consummation by BBI and Mr. Prager of the transactions contemplated
hereby and thereby or the performance by BBI and Mr. Prager of their
obligations hereunder and thereunder;

(d)     Affiliates. There is no agreement, understanding or
arrangement between BBI or Mr. Prager and any affiliate of BBI;

(e)     Compliance with Applicable Law. BBI is and has been at all
times in compliance with all applicable material requirements of law;

(f)     Legal Proceedings. There are no legal or administrative
proceedings or arbitrations, and no claims, actions or governmental

Mr. Paul Prager                                  -7-                                  March 30, 1999

investigations of any nature pending against BBI, Mr. Prager or the Project or to which BBI, Mr. Prager or any of their properties or assets or the Project is subject;

(g)     No Broker Fee.  Neither BBI nor Mr. Prager is obligated to pay any broker fee in connection with the consummation of the transactions contemplated under this Letter Agreement, the Preferred Stock Certificates and the Warrant Certificates; and

(h)     Capitalization.  (i) As of the date hereof, the authorized capital stock of BBI consists of 2,000 shares of Preferred Stock and 2,000 shares of common stock, par value $.01 per share ("Common Stock").  As of the date hereof, no share of Preferred Stock is issued and outstanding, and 1,000 shares of Common Stock are issued and outstanding and no shares of Common Stock are held in treasury.  All of the issued and outstanding shares of BBI's capital stock have been duly and validly authorized and issued and are fully paid and nonassessable and not subject to preemptive rights and are owned of record and beneficially by Mr. Prager;

(ii)     The shares of Preferred Stock, when issued and delivered in accordance with the terms of this Letter Agreement, will be duly authorized, validly issued, fully paid and nonassessable and not subject to preemptive rights;

(iii)    The shares of Common Stock issuable upon exercise of the Warrants have been reserved for issuance and, when issued upon exercise of the Warrants, will be duly and validly authorized and issued, fully paid and nonassessable and not subject to preemptive rights, and the owner of such shares will acquire good title thereto, free and clear of all liens (other than any lien created by such owner);

(iv)     Other than the requirement to issue the Preferred Stock and the Warrants in accordance with the terms of this Letter Agreement, (1) no equity securities of BBI are or may become required to be issued by reason of any options, warrants, rights to subscribe to, calls, preemptive rights, or commitments of any character whatsoever, (2) there are outstanding no securities or rights convertible into or exchangeable for shares of any capital stock of BBI and (3) there are no contracts, commitments, understandings or arrangements by which BBI is or will be bound to issue additional shares of its capital stock or securities or rights convertible into or exchangeable for shares of its capital stock or options, warrants or rights to purchase or acquire

Mr. Paul Prager                              -8-                         March 30, 1999

any additional shares of its capital stock. BBI is not subject to any obligation (contingent or otherwise) to repurchase, redeem or otherwise acquire or retire any of its capital stock; and

     (v)    The only asset of BBI is its interest in the Project, and the only liabilities of BBI are as set forth in Schedule 7.1(h).

8.    <u>Transfer Restrictions</u>. Mr. Prager agrees that he shall not transfer or otherwise dispose of any shares of the Common Stock until all of the Preferred Stock is fully redeemed together with accrued dividends thereon.

9.    <u>Covenants</u>. Each of BBI and Paul Prager jointly and severally covenants as follows:

    (a)    As long as at least 510 shares of Preferred Stock remain outstanding, BBI shall not declare or pay any dividend or other distribution on its Common Stock or repurchase, redeem or otherwise acquire any of its Common Stock;

    (b)    As long as any Warrants remain outstanding, BBI and Mr. Prager shall give the Investors not less than 20 business days' notice of the record date for any dividend or distribution on Common Stock in order to enable the Investors to exercise their warrants;

    (c)    As long as at least 510 shares of Preferred Stock remain outstanding, BBI shall not enter in any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or dispose of, all or <u>a material portion of its assets</u>;

    (d)    As long as at least 510 shares of Preferred Stock remain outstanding, BBI shall not create, incur, assume or suffer to exist any lien upon any of its property now owned or hereafter acquired, except for liens arising by operation of law;

    (e)    BBI and Mr. Prager shall permit a designated representative of the Investors to visit and inspect any of BBI's properties and examine and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of BBI with officers and employees of BBI and with its independent certified public accountants;

. Mr. Paul Prager                    -9-                    March 30, 1999

(f)     As long as at least 510 shares of Preferred Stock remain outstanding, BBI shall not incur any indebtedness unless the creditor in question agrees in writing that such indebtedness is junior in priority to the Preferred Stock.

(g)     Upon request of the Investors, BBI and Mr. Prager shall execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Letter Agreement.

10.     Tag-Along Rights. (a) In the event that Mr. Prager proposes to transfer at any time all or any portion of the Common Stock owned by Mr. Prager, Mr. Prager shall notify the Investors in writing (a "Transfer Notice") of such proposed sale (a "Proposed Sale") and the material terms of the Proposed Sale (the "Material Terms"). The Transfer Notice shall be delivered to the Investors not less than fifteen (15) days prior to the consummation of the Proposed Sale and not more than five (5) days after the execution of the definitive agreement relating to the Proposed Sale, if any (the "Sale Agreement"). If within (10) days of receipt by the Investors of such Notice, Mr. Prager receives from the Investors, or their successors and assigns, a written request (a "Request") to include in the Proposed Sale of the Common Stock or Warrants owned by the Investors so requested shall be included in the Proposed Sale;

(b)     Except as may otherwise be provided herein, the Investors' Common Stock or Warrants subject to a Request shall be included in a Proposed Sale pursuant hereto and in any agreements with purchasers relating thereto on the same terms and subject to the same conditions applicable to the Common Stock which Mr. Prager proposes to sell in the Proposed Sale. For the purposes of this Section, the Warrants are treated the same as the Common Stock; and

(c)     The number of Common Stock or Warrants which each Investor will be permitted to include in a Proposed Sale pursuant to a Request will be any amount of Common Stock or Warrants owned by such Investor not to exceed a percentage of the aggregate Warrants and Common Stock owned by such Investor that is equal to the percentage of the aggregate Common Stock owned by Mr. Prager that

Mr. Paul Prager                    -10-                    March 30, 1999

are being transferred in the transaction subject to such Transfer Notice.

11.    Drag-Along Rights. In the event that after the restriction on transfer period pursuant to Section 8 above Mr. Prager proposes to transfer to a non-affiliate all of the Common Stock owned by Mr. Prager, Mr. Prager will have the right, exercisable upon not less than fifteen (15) days' prior notice from Mr. Prager, to require that the Investors transfer all of the Common Stock and Warrants owned by the Investors on the same terms and conditions as the transfer of the Common Stock proposed to be made by Mr. Prager. The Warrants owned by the Investors shall be transferred for the same consideration per share of underlying Common Stock as the Common Stock.

12.    Transactions with Affiliates. Until such time as the Preferred Stock has been fully redeemed together with accrued dividends thereon and the Investors no longer own any warrants or capital stock of BBI, all transactions between BBI and its subsidiaries, on the one hand, and Mr. Prager or any other affiliate of BBI, on the other hand, will be on arms-length terms, no less favorable to BBI or such subsidiary than the terms that would be obtained from a non-affiliate.

13.    Registration Rights. At the request of the Investors, BBI shall enter into a registration rights agreement in form and substance reasonably satisfactory to the Investors and BBI, providing the Investors with three demand registration rights, which shall be exercisable only after an initial public offering of BBI, and an unlimited number of piggyback registration rights. Such registration rights agreement shall be on customary terms and conditions, which terms and conditions, in any event, shall be no less favorable than those provided to Mr. Prager with respect to any registration rights he may have.

14.    Pre-Emptive Rights. In the case of any proposed issuance of shares of any class of capital stock of BBI or any options, warrants or other rights to acquire such capital stock securities convertible into or exchangeable for shares of any class of capital stock of BBI, each Investor shall have the right, on the same terms as those of the proposed issuance to purchase a proportion of such shares of capital stock or securities, warrants, options or rights equal to the Investors' percentage ownership on a fully diluted basis (as if the Warrants held by such Investor had been exercised, whether or not actually

`Mr. Paul Prager                    -11-                    March 30, 1999

exercised) of BBI's common stock prior to such issuance. The price
or prices and terms for such shares of capital stock, securities,
warrants, options or rights shall be identical to the price or prices and
terms at which such shares of capital stock, securities, warrants,
options or rights are proposed to be offered for sale or granted to
others.

15.     All Decisions by the Investors.  All decisions, consents or approvals
by the Investors pursuant to this Letter Agreement, the Preferred
Stock Certificates or the Warrant Certificates shall be made by a
majority in aggregate principal amount of the Investors' commitments
as set forth in this Letter Agreement.

16.     Reimbursement and Fee.  At the time of the Project Financial Close of
the Project, BBI shall reimburse the Investors for out-of-pocket legal
and transaction fees and expenses not to exceed $25,000.

17.     Governing Law.  This Letter Agreement shall be governed by, and
construed in accordance with, the laws of the State of New York.

18.     Confidentiality.  Each of the Investors, BBI and Mr. Prager agrees not
to disclose the terms of this Letter Agreement to any third party and to
take all necessary measures to prevent any such disclosure by its
employees, agents, contractors or consultants for a period of 3 years
after the date of this Letter Agreement.

19.     Notices.  All notices, requests, claims, demands and other
communications hereunder shall be in writing and shall be given (and
shall be deemed to have been duly given upon receipt) by delivery in
person, by telecopy with confirmation or by registered or certified
mail (postage prepaid, return receipt requested) to the respective
parties at the following addresses (or at such other address for a party
as shall be specified by like notice):

if to BBI or Paul Prager:

BBI Power Corporation
Manor House
208 Pier One Road
Stevensville, MD 21666
Attention: Paul Prager

MAR-31-99 WED 02:29 PM   S[...]                        FAX No. 212 455 2502              [...]

Mr. Paul Prager                          -12-                        March 30, 1999

Facsimile:  (410) 643-9809

if to the Investors:

c/o Evercore Partners Inc.
65 East 55th Street
33rd Floor
New York, New York  10022
Attention:  Christopher L. Ryan
Facsimile:  (212) 857-3152

with copy to:

Simpson Thacher & Bartlett
425 Lexington Avenue
New York, New York  10017
Attention:  Richard Capelouto
Facsimile:  (212) 455-2502

If any term, provision, covenant or restriction contained in this Letter Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

BBI and Mr. Prager shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, void or unenforceable provisions.

Investors shall not have any rights as stockholder of BBI, including the right to vote, consent or receive notices as stockholder with respect to any meeting of stockholders for the election of directors of BBI or any other matter or to participate in the management and operation of BBI in any capacity, except as provided herein.

This Letter Agreement may be executed in counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument. Delivery of an executed signature page of this Letter Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Very truly yours,

ROGER ALTMAN

By:
Title:

AUSTIN BEUTNER

By:
Title:

JOHN BIRK

By:
Title:

MICHAEL JORDAN

By:
Title:

CURTIS LANE

By:
Title:

MAR-31-99 WED 02:20 PM    STS-AG                    FAX NO. 212 489 2543

MAR-29-99 MON 03:24 PM                    FAX NO.                    P. 03

This Letter Agreement may be executed in counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument. Delivery of an executed signature page of this Letter Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Very truly yours,

ROGER ALTMAN

By: _____
Title:

AUSTIN BEUTNER

By: _____
Title:

JOHN BIRK

By: _____
Title:

MICHAEL JORDAN

By: _____
Title:

CURTIS LANE

By: _____
Title:

MAR-31-99 WED 02:21 PM   SBS-··                    FAX NO. 212 ··· 2502                    P. 19

03/29/99   10:22  FAX                                                                        002
MAR-29-99 MON 10:14 AM                        FAX NO.                              P. 03/05

This Letter Agreement may be executed in counterparts, each of which will
be deemed an original, but all of which taken together will constitute one and the same
instrument. Delivery of an executed signature page of this Letter Agreement by facsimile
transmission shall be effective as delivery of a manually executed counterpart hereof.

Very truly yours,

ROGER ALTMAN

By:
Title:


AUSTIN BEUTNER

By:
Title:

JOHN BIRK

By:
Title:


MICHAEL JORDAN

By:
Title:


CURTIS LANE

By:
Title:

MAR-31-99 WED 02:21 PM    STB-HH

MAR 29 '99 15:01 FR (W) CHAIRMAN                    TO 812124552502        P.02/02
                                        FAX NO.                           P, 04/05

FAX NO. 2.2 456  502                                                          P. 9

This Letter Agreement may be executed in counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument. Delivery of an executed signature page of this Letter Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Very truly yours,

ROGER ALTMAN

By: _____
Title:

AUSTIN BEUTNER

By: _____
Title:

JOHN BIRK

By: _____
Title:

MICHAEL JORDAN

By: _____
Title:

CURTIS LANE

By: _____
Title:

MAR-31-99 WED 02:21 PM  SIS-HS                    FAX NO. 212 455 2502            P. 25

This Letter Agreement may be executed in counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument. Delivery of an executed signature page of this Letter Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

Very truly yours,

ROGER ALTMAN

_____
By:
Title:


AUSTIN BEUTNER

_____
By:
Title:


JOHN BIRK

_____
By:
Title:


MICHAEL JORDAN

_____
By:
Title:


CURTIS LANE

_____
By:
Title:

NEERAJ MITAL

_Neeraj Mital_

By: NEERAJ MITAL
Title:


DAVID PECKER


By:
Title:


CHRISTOPHER RYAN


By:
Title:


PAUL YOVOVICH


By:
Title:


BRIAN BOORSTEIN


By:
Title:


ROD DAMMEYER


By:
Title:

NEERAJ MITAL

By:
Title:

DAVID PECKER

By:
Title:

CHRISTOPHER RYAN

By:
Title:

PAUL YOVOVICH

By:
Title:

BRIAN BOORSTEIN

By:
Title:

ROD DAMMEYER

By:
Title:

NEERAJ MITAL

By:
Title:


DAVID PECKER

By:
Title:


CHRISTOPHER RYAN

By:
Title:


PAUL YOVOVICH

By:
Title:


BRIAN BOORSTEIN

By:
Title:


ROD DAMMEYER

By:
Title:

ADVANCE ROSS CORP.:    ID:                     MAR 29'99   17:05 No.006 P.02

NEERAJ MITAL

By:
Title:

DAVID PECKER

By:
Title:

CHRISTOPHER RYAN

By:
Title:

PAUL YOVOVICH

By:
Title:

BRIAN BOORSTEIN

By:
Title:

ROD DAMMEYER

By:
Title:

NEERAJ MITAL

By:
Title:

DAVID PECKER

By:
Title:

CHRISTOPHER RYAN

By:
Title:

PAUL YOVOVICH

By:
Title:

BRIAN BOORSTEIN

By: BRIAN BOORSTEIN
Title:

ROD DAMMEYER

By:
Title:

MAR-29-99 MON 03:24 PM                          FAX NO.                    P. 04

NEERAJ MITAL

By:
Title:

DAVID PECKER

By:
Title:

CHRISTOPHER RYAN

By:
Title:

PAUL YOVOVICH

By:
Title:

BRIAN BOORSTEIN

By:
Title:

ROD DAMMEYER

By:
Title:

MAR-29-99 MON 03:24 PM                    FAX NO.                    P. 05
** TOTAL PAGE.005 **

WILLIAM PATE

By:
Title:


DAVID ROSEN

By:
Title:


SZ INVESTMENTS, L.L.C.

By:
Title:


JEFFREY WELLEK

By:
Title:


Accepted and agreed to as of
the first written above by:

BBI POWER CORPORATION

By:
Title:


PAUL PRAGER

By:
Title:

WILLIAM PATE

By:
Title:


DAVID ROSEN

By:
Title:


SZ INVESTMENTS, L.L.C.

By:
Title:


JEFFREY WELLEK

By:
Title:


Accepted and agreed to as of
the first written above by:

BBI POWER CORPORATION

By:
Title:


PAUL FRAGER

By:
Title:

MAR-30-99 TUE 12:22 PM    EVERCORE PARTNERS    FAX NO. 212 857 3172    P. 02
MAR-30-1999  18:25         ROSENBERG&LIEBENTRITT,P.C         312 454 8555    P.02.02

WILLIAM PATE

By:
Title:

DAVID ROSEN

By:
Title:

SZ INVESTMENTS, L.L.C.

By: Rod /f. Dammeyer
Title: Vice President

JEFFREY A. WELLEK REVOCABLE

By:
Title:

Accepted and agreed to as of
the first written above by:

BBI POWER CORPORATION

By:
Title:

PAUL PRAGER

By:
Title:

017325-0001-02535-9938N934•LRT

TOTAL P.02

WILLIAM PATE

By:
Title:

DAVID ROSEN

By:
Title:

SZ INVESTMENTS, L.L.C.

By:
Title:

JEFFREY A. WELLEK REVOCABLE
TRUST

By:    *Jeffrey A. Wellek*
Title:    *Trustee*

Accepted and agreed to as of
the first written above by:

BBI POWER CORPORATION

By:
Title:

PAUL PRAGER

By:
Title:

WILLIAM PATE

By:
Title:

DAVID ROSEN

By:
Title:

SZ INVESTMENTS, L.L.C.

By:
Title:

JEFFREY WELLEK

By:
Title:

Accepted and agreed to as of
the first written above by:

BBI POWER CORPORATION

By:     Paul B. Prager
Title:  President

PAUL PRAGER

By:  Paul B. Prager

Schedule 1

Total Commitments of the Investors

Evercore Group

| | |
|---|---:|
| Roger Altman | $ 100,000 |
| Austin Beutner | 100,000 |
| John Birk | 50,000 |
| Michael Jordan | 100,000 |
| Curtis Lane | 50,000 |
| Neeraj Mital | 50,000 |
| David Pecker | 50,000 |
| Christopher Ryan | 50,000 |
| Paul Yovovich | 100,000 |
| Total Evercore Group | $ 650,000 |

EGI Group

| | |
|---|---:|
| Brian Boorstein | $ 25,000 |
| Rod Dammeyer | 50,000 |
| William Pate | 50,000 |
| David Rosen | 25,000 |
| SZ Investments, L.L.C. | 175,000 |
| Jeffrey A. Wellek Revocable Trust | 25,000 |
| Total EGI Group | $ 350,000 |
| Total Commitments | $1,000,000 |

Schedule 7.1(h)

Exclusive of routine operating costs, BBI liabilities include:

1. Centreville National Bank $ 25,000.00
   408 Thompson Creek Road
   Stevensville, Maryland 21666-0279

2. John E. Grimmer, Esquire $ 43,000.00
   Kirlin, Campbell & Keating
   5 Hanover Square
   New York, New York 10004

3. James Notaris, C.P.A. $ 39,000.00
   Notaris & Associates
   805 Third Avenue
   New York, New York 10022

# EXHIBIT   B

# FIRST AMENDEMENT

## TO

## LETTER AGREEMENT OF

## BBI POWER CORPORATION

FIRST AMENDMENT to the LETTER AGREEMENT dated as of the 30th of March 1999 (the "First Amendment"), between BBI POWER CORPORATION, a Delaware corporation ("BBI") and the INDIVIDUAL INVESTORS (collectively, the "Investors");

WHEREAS, BBI Power Corporation and the Investors are parties to the Letter Agreement dated 30th of March with respect to BBI Power;

WHEREAS, the Investors currently own 1000 shares in aggregate of Series A Preferred Stock ($1,000,000 aggregate liquidation preference) (the "Series A" Preferred);

WHEREAS, the Investor group has agreed to purchase from BBI up to _____ dollars of Series B Preferred Stock (the "Series B Preferred") and warrants exercisable up to a 7.5% fully diluted equity interest in BBI (the "Series B Warrants");

WHEREAS, BBI and the Investors desire to Amendment the Letter Agreement, in certain respects, as more fully set forth herein;

NOW THEREFORE, inconsideration of the premises and the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties mutually covenant and agree as follows:

1.  Definitions. All capitalized terms used in this First Amendment and not otherwise defined herein shall have the meanings ascribed to them in the Letter Agreement.

2.  Amendment to Article 1. Article 1 of the Letter Agreement is amended by deleting it in its entirety and replacing it with:

1(a). <u>The Series A Preferred Stock</u>. The aggregate purchase price for the Series A Preferred Stock and the Warrants shall be $1,000,000 with each individual Investor's proportionate share being determined by the amount of such Investor's commitment as set forth in Schedule 1. The Series A Preferred Stock and the Warrants shall be purchased in three installments, on 5 business days' written notice from BBI to the Investors, subject to the following maximum aggregate purchase price for each installment:

| | |
|---|---|
| Upon execution of this Letter Agreement: | $600,000 |
| Three Month Anniversary of the date of Letter Agreement: | $200,000 |
| Six Month Anniversary of the date of This Letter Agreement: | $200,000 |

1(b). <u>The Series B Preferred Stock</u>. The aggregate purchase price for the Series B Preferred Stock and the Warrants shall be _____ each individual Investor's proportionate share being determined by the amount of such Investor's commitment. The Series B Preferred Stock and the Warrants shall be purchased upon execution of this First Amendment to the Letter Agreement.

1(c). The Series A Preferred Stock and the Warrants and the Series B Preferred Stock and the Warrants will be collectively defined as the Preferred Stock with identical terms and conditions.

3. <u>Amendment to Article 4 Redemption</u>. Article 4 of the Letter Agreement is hereby amended by restating each of paragraphs 4(a), 4(b) and 4(c) and adding the following after paragraph 4(c):

(d) <u>Investor Initiated Redemption</u>. Investors purchasing Series B Preferred will have the right to initiate steps to a mandatory redemption of the "Preferred Stock" (Investor Initiated Redemption) in the event BBI does not execute a definitive agreement with a strategic investor to finance the project by September 1, 2000. The Redemption Price will be 200% of the liquidation preference of the Preferred Stock, plus accrued and unpaid dividends. The Investors acting as a group and BBI will use respective and reasonable judgement to mutually agree upon the preferred alternative strategy to generate cash proceeds to finance the Investor Initiated Redemption. In the event the Investors call for an Investor Initiated Redemption the Warrants will cease to be exercisable and will instead be limited to exercise to BBI's share of the Project.

4. <u>Counterparts</u>. This First Amendment may be executed in one or more counterparts, each of which when taken together with all original counterparts will constitute one and the same instrument.

5. <u>Governing Laws</u>. This First Amendment shall be governed by the laws of the State of New York.

6.　　Amendment and Waiver.  No amendment, modification or waiver of any provision of this First Amendment shall be valid or effective unless made by one or more instruments in writing and signed by each of the parties hereto.

7.　　Entire Agreement.  The Letter Agreement as amended by this First Amendment constitutes the entire agreement between the parties hereto with respect to the matters dealt with herein and supersedes any previous agreement among the parties hereto, whether oral or written, in relation to such matters.

8.　　Ratification.  Except as expressly set forth herein, the Letter Agreement is not modified hereby and shall remain in full force and effect in accordance with the respective provisions thereof on the date hereof, and the Letter Agreement is in all respect ratified and confirmed.

Very truly yours,

ROGER ALTMAN

By: _____
Title:

AUSTIN BEUTNER

By: _____
Title:

JOHN BIRK

By: _____
Title:

MICHAEL JORDAN

By: _____
Title:

CURTIS LANE

By: _____
Title:

NEERAJ MITAL

By: _____
Title:

DAVID PECKER

By: _____
Title:

CHRISTOPHER RYAN

By: _____
Title:

PAUL YOVOVICH

By: _____
Title:

BRIAN BOORSTEIN

By: _____
Title:

ROD DAMMEYER

By: _____
Title:

WILLIAM PATE

By: _____
Title:

DAVID ROSEN

By: _____
Title:

SZ INVESTMENTS, L.L.C.

By: _____
Title:

JEFFREY WELLEK

By: _____
Title:

Accepted and Agreed to as of
the first written above by:

BBI POWER CORPORATION

By: _____
Title:

PAUL PRAGER

By: _____

# Exhibit C

# SECOND AMENDMENT

## TO

### LETTER AGREEMENT OF

## BBI POWER CORPORATION

SECOND AMENDMENT (the "Second Amendment") to the LETTER AGREEMENT dated as of the 30th of March 1999 (the "Letter Amendment No. 2"), between BBI POWER CORPORATION, a Delaware corporation ("BBI"), and the INDIVIDUAL INVESTORS (collectively, the "Investors");

WHEREAS, BBI and the Investors are parties to the Letter Agreement dated 30th of March 1999 with respect to BBI;

WHEREAS, BBI and the Investors are parties to the First Amendment dated 30th of March 2000 with respect to BBI;

WHEREAS, the Investors currently own 1,000 shares in aggregate of Series A Preferred Stock ($1,000,000 aggregate liquidation preference) (the "Series A Preferred Stock") and 176.5 warrants to purchase shares of common stock exercisable into a 15% fully diluted equity interest in BBI or the Project (the "Warrants");

WHEREAS, the Investors currently own 500 shares in aggregate of Series B Preferred Stock ($500,000 aggregate liquidation preference) (the "Series B Preferred" Stock ) and warrants to purchase shares of common stock exercisable up to an additional 7.5% fully diluted equity interest in BBI or the Project (the "Series B Warrants");

WHEREAS, the Investors have agreed to purchase from BBI up to $500,000 of Series C Preferred Stock ($500,000 aggregate liquidation preference) (the "Series C Preferred" Stock) and redeemable warrants to purchase shares of common stock exercisable up to an additional 7.5% fully diluted equity interest in BBI or the Project (the "Series C Redeemable Warrants").

WHEREAS, BBI and the Investors desire to amend the Letter Agreement, in certain respects, as more fully set forth herein;

NOW THEREFORE, in consideration of the premises and the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties mutually covenant and agree as follows:

1.  <u>Definitions</u>.  All capitalized terms used in this First Amendment and not otherwise defined herein shall have the meanings ascribed to them in the Letter Agreement.

2.  <u>Amendment to Article 1</u>.  Article 1 of the Letter Agreement is amended by deleting it in its entirety and replacing it with:

1(a).  <u>The Series A Preferred Stock</u>.  The aggregate purchase price for the Series A Preferred Stock and the Warrants shall be $1,000,000 with each individual Investor's proportionate share being determined by the amount of such Investor's commitment as set forth in Schedule 1.  The Series A Preferred Stock and the Warrants shall be purchased in three installments, on 5 business days' written notice from BBI to the Investors, subject to the following maximum aggregate purchase price for each installment:

| | |
|---|---|
| Upon execution of this Letter Agreement: | $600,000 |
| Three Month Anniversary of the date of Letter Agreement: | $200,000 |
| Six Month Anniversary of the date of This Letter Agreement: | $200,000 |

1(b).  <u>The Series B Preferred Stock</u>.  The aggregate purchase price for the Series B Preferred Stock and the Series B Warrants shall be $500,000 with each individual Investor's share set forth in Attachment A to this First Amendment.  The Series B Preferred Stock and the Series B Warrants shall be purchased upon execution of this First Amendment to the Letter Agreement.

1(c).  <u>The Series C Preferred Stock</u>.  The aggregate purchase price for the Series C Preferred Stock and the Series C Redeemable Warrants shall be $500,000 with each individual Investor's share set forth in Attachment A to this Second Amendment. The Series C Preferred Stock and the Series C Redeemable Warrants shall be purchased upon execution of this Second Amendment to the Letter Agreement.

1(d).  The Series A Preferred Stock and the Warrants and the Series B Preferred Stock and the Series B Warrants and the Series C Preferred Stock and the Series C Redeemable Warrants will be collectively defined as the Preferred Stock with identical terms and conditions, other than the redemption provisions for the Series C Preferred Stock as described in Article 4(e) and Article 6, respectively.

3.  Amendment to Article 4 Redemption. Article 4 of the Letter Agreement is hereby amended by restating each of paragraphs 4(a), 4(b), 4(c) and 4(d) and adding the following after paragraph 4(e):

(d)  Investor Initiated Redemption. Investors purchasing Series C Preferred Stock will have the right to initiate a mandatory redemption of the Preferred Stock ("Investor Initiated Redemption") in the event BBI does not execute by June 30, 2001 a definitive agreement with a strategic investor to finance the project. The redemption price will be 200% of the liquidation preference of the Preferred Stock, plus accrued and unpaid dividends. The Investors acting as a group and BBI will use respective and reasonable judgment to mutually agree upon the preferred alternative strategy to generate cash proceeds to finance the Investor Initiated Redemption. In the event the Investors call for an Investor Initiated Redemption, the Warrants will cease to be exercisable and will instead be limited to exercise into an equivalent percentage interest of BBI's share of the Project.

(e)  Series C Redemption. The Series C Preferred Stock is, at the option of BBI, subject to redemption for a cash amount in accordance to the following schedule:

(i)  Prior to March 31, 2001, in an amount equal to 150% of the aggregate liquidation preference per share;

(ii)  After March 31, 2001 and prior to June 30, 2001, in an amount equal to 158% of the aggregate liquidation preference per share;

(iii)  After June 30, 2001, in an amount equal to 200% of the aggregate liquidation preference per share;

Plus in each case any accrued and unpaid dividends.

4.  Amendment to Article 6 Warrants. The Series C Redeemable Warrants should be allocated among the Series C Investors pro rata in accordance with the Redeemable Series C Investors respective commitments. The Series C Redeemable Warrants will be similar in all respects to the Series A and Series B Warrants, other than Series C redemption feature. The Series C Redeemable Warrants are subject to redemption, at the option of BBI, for a cash amount of $.01 per share if the Series C Preferred Stock has been redeemed pursuant to Article 4(e), in accordance with the following schedule:

(i)  If the Series C Preferred Stock has been redeemed prior to March 31, 2001, Series C Redeemable Warrants exercisable into 5.625% of BBI or the Project may be redeemed;

(ii)  If the Series C Preferred Stock has been redeemed after March 31, 2001 and prior to June 30, 2001, Series C Redeemable Warrants exercisable into 3.75% of BBI or the Project may be redeemed;

(iii)  The Series C Redeemable Warrants are not redeemable by BBI after 6/30/01.

In addition, if the Series C Preferred Stock has not been redeemed prior to 9/30/01, then the Series C Investors will be entitled to receive Series D Warrants exercisable into 0.50% of BBI or the Project on the first day of each month thereafter, subject to a maximum of 2.5% in the aggregate. Holders of Warrants issued in connection with the purchase of Series A and B Preferred Stock will receive additional warrants (the "Antidilution Warrants") as indicated on

Attachment B to this Second Amendment to eliminate dilution resulting from the issuance of Redeemable Series C Warrants and Series D Warrants.

     5.    <u>Counterparts</u>. This Second Amendment may be executed in one or more counterparts, each of which when taken together with all original counterparts will constitute one and the same instrument.

     6.    <u>Governing Laws</u>. This Second Amendment shall be governed by the laws of the State of New York.

     7.    <u>Amendment and Waiver</u>. No amendment, modification or waiver of any provision of this Second Amendment shall be valid or effective unless made by one or more instruments in writing and signed by each of the parties hereto.

     8.    <u>Entire Agreement</u>. The Letter Agreement as amended by this Second Amendment constitutes the entire agreement among the parties hereto with respect to the matters dealt with herein and supersedes any previous agreement among the parties hereto, whether oral or written, in relation to such matters.

     9.    <u>Ratification</u>. Except as expressly set forth herein, the Letter Agreement is not modified hereby and shall remain in full force and effect in accordance with the respective provisions thereof on the date hereof, and the Letter Agreement is in all respect ratified and confirmed.

Very truly yours,

JOHN BIRK


By: _____
Title:

MICHAEL JORDAN


By: _____
Title:

DAVID PECKER


By: _____
Title:

CHRISTOPHER RYAN


By: _____
Title:

PAUL YOVOVICH


By: _____
Title:

BRIAN BOORSTEIN


By: _____
Title:

ROD DAMMEYER

By: _____
Title:

JEFFREY KLEIN

By: _____
Title:

WILLIAM PATE

By: _____
Title:

DAVID ROSEN

By: _____
Title:

SZ INVESTMENTS, L.L.C.

By: _____
Title:

JEFFREY A. WELLEK
REVOCABLE TRUST

By: _____
Title:

Accepted and Agreed to as of
the first written above by:

BBI POWER CORPORATION

By: _____
Title:

PAUL PRAGER

By: _____

# Exhibit D

**CONTINENTAL ENERGY SERVICES, INC.**
**"PURCHASER" TERM SHEET**

### General

- The business of BBI Power Corporation ("BBI") will be combined with a new Delaware limited liability company ("Acquisition Co.") through either a merger or a transfer of assets. Acquisition Co. will then acquire 100% of the capital stock of Continental Energy Services, Inc. ("CES"), an indirect, wholly owned subsidiary of Montana Power Company, for $[85] million in cash. The closing of this business combination and the CES acquisition are expected to occur in January, 2001 and are to occur essentially simultaneously. The final terms of these transactions (including the value of BBI) have yet to be agreed upon, but it is understood that BBI's assets shall not include BBI's Indian project. Moreover, there shall be no liability on the part of any person or entity with respect to the matters referred to herein unless and until definitive agreements for such transactions have been executed and delivered by the appropriate parties.

### Capital

- Paul Prager ("Prager") and an affiliate of Equity Group Investments, L.L.C. (such affiliate "EGI") will each invest $5 million in cash in Acquisition Co. in exchange for voting securities of Acquisition Co. The vote attributable to such securities shall be weighted such that, even if EGI does not contribute additional capital (see below), EGI shall have not less than 51% of the vote.

- Prager and EGI will endeavor to raise the balance of the purchase price from third party investors through a non-voting equity issue by Acquisition Co. EGI may contribute additional capital at its own discretion, but if and to the extent it did so it would be issued voting securities of the same class as it received for its initial $5 million of capital.

- The terms of the equity issue for the additional capital shall be reasonably acceptable to Prager and EGI, but if sufficient additional capital is not raised by November 15, 2000, then EGI shall have the right to take control of the process and determine all terms of the issue (including the identity

of all participants) and in such event EGI shall also have the right (i) to sell down (or outright) its interest in this transaction, and/or (ii) on behalf of EGI and Prager, to sell and transfer the right to acquire CES (but not the BBI business combination).

## Promote

- Any promote due the EGI/Prager capital *vis~a~vis* the non-voting equity interests shall be shared 50/50 between EGI and Prager - except as described below.

- If EGI funds more than $20 million in addition to its initial $5 million investment, the excess funded over the additional $20 million shall increase EGI's share of both the promote proportionately dollar-for-dollar by the amount of the excess. For example, if EGI funds $25 million, the excess would be $5 million, so that EGI would receive 2/3 (10/15) of the promote and Prager would receive 1/3 (5/15) of the promote.

## Management

- EGI shall designate not less than a majority of the directors on Acquisition Co.'s board. Prager shall be a "non-EGI designated" director of Acquisition Co. The parties intend to recruit high caliber, industry knowledgeable individuals to serve on Acquisition Co.'s board. The CES board will be identical to the board of Acquisition Co.

- Prager will serve as the Chief Executive Officer of Acquisition Co. and of CES, reporting directly to the two boards. Prager will enter into a customary employment agreement containing a standard non-compete clause.

- It is expected that existing CES personnel will remain in place.

## Restrictions on Transfer

- Neither EGI nor Prager shall be permitted to transfer voting equity in Acquisition Co. to any third party (other than affiliated "permitted transferees") without first having offered it to the other party at substantially identical terms.

- 2 -

## Prager Loan

- EGI will loan Prager the full $5 million of capital required of him. The loan will have the following basic terms: (i) recourse against Prager shall be limited to Prager's interest in Acquisition Co. and his interest in BBI's Indian project, (ii) interest accrues at LIBOR plus 4% per annum, with accrued interest capitalized quarterly, (iii) all distributions (other than tax distributions) payable from Acquisition Co. to Prager shall be paid to EGI against the note, (iv) unpaid interest and principal will be due in one lump sum at maturity, (v) pre-payable at any time from time to time without penalty, and (vi) matures on the first to occur of (a) a liquidation event with respect to Acquisition Co. and (b) the fifth anniversary of the CES closing.

- 3 -

# Exhibit E



**BBI**

POWER CORPORATION

September 12, 2000

The Montana Power Company
c/o Mr. Thomas K. Amster
Vice President
Goldman, Sachs & Co.
2121 Avenue of the Stars, S-2600
Los Angeles, CA 90067

Dear Mr. Amster:

This letter is in response to your letter of July 25, 2000 requesting our definitive binding proposal to acquire all of the outstanding shares of common stock of Continental Energy Services, Inc. ("CES").

Before responding to the specific items outlined in your letter, we want to thank you again for the very professional manner in which this process has been conducted. We are confident and hope you and the Montana Power Company will agree that BBI is the right home for the CES business.

Set below are our responses to each of the questions raised in your letter:

1.  BBI seeks to acquire 100% of the shares of common stock of Continental Energy Services, Inc. with a 338 (h)(10) election.

2.  BBI will pay eighty-two million and five hundred thousand dollars to acquire the common stock of CES. Our proposal assumes a valuation of $40 million for the Ferndale, Washington Project. Our proposal is based on the CES consolidated proforma balance sheet as of July 31, 2000, as provided by Goldman Sachs. In addition, our proposal is subject to satisfactory negotiation and execution of a definitive Stock Purchase Agreement (the "Agreement").

3.  Please find enclosed the Stock Purchase Agreement clearly marked in writing together with additional comments and riders to show all changes that we request. We are prepared to promptly execute the Agreement in the form attached.

4.  BBI has sufficient cash and available facilities to pay the Purchase Price and to make all other necessary payments of fees and expenses in connection with this transaction. BBI's proposal does not contemplate any financing contingency.

5.  There is no due diligence contingency associated with our proposal.

6.  The acquisition entity is BBI Power Corporation, a Delaware corporation.

7.   BBI values CES's IPP development capability.   BBI intends to support management to mature the existing development pipeline and mine additional domestic development opportunities.   BBI intends to maintain the CES team intact and to provide the necessary capital structure and development resources to position CES as a world class IPP in the near future.  BBI intends to maintain the corporate offices of CES in Butte, Montana.

8.   This definitive binding proposal and mark-up of the Agreement has been approved by BBI's Board of Directors.   No further corporate approvals are required.

9.   BBI is not aware of any regulatory filings or approval required other than those under FERC and HSR.

10.  BBI is prepared to close at your earliest convenience.  Our experience would indicate that the requisite regulatory approvals will be possible 75 to 90 days from the date of execution of the Stock Purchase Agreement.  For that reason we have scheduled closing in early January 2001.

11.  Any questions regarding this proposal should be directed to the following individuals:

BBI

Mr. Paul B. Prager, President and Chief Executive Officer (410) 643-9500
Mr. Sam Zell, Equity Group Corporate Investments (312) 466-4091

Kelley Drye & Warren

Mr. Alan Epstein, Esq. (212) 808-7800

As you know, I have a longstanding and close personal relationship with the CES team and have worked closely with them on several projects over the past many years.  I am enthusiastic about the prospect of combining the CES team with the BBI team.

Thank you for providing this opportunity to acquire Continental Energy Services, Inc.  I hope that our proposal is consistent with your expectations and deemed worthy to proceed to final negotiations of the terms of a definitive agreement.

We look forward to your earliest notification.

Very truly yours,
BBI Power Corporation


Paul B. Prager
President and Chief Executive Officer

# EXHIBIT F



*VIA FACSIMILE AND POST*

September 21, 2000

Mr. Sam Zell
Chairman of the Board
Equity Group Corporate Investments
Two 39 North Riverside Plaza
Chicago, IL 60606

Dear Sam:

We have "it" in the corral. Montana Power Company's press release is attached. I mentioned to Don that I would schedule a trip to Chicago in the next few weeks to sit with you and discuss next steps. First, I intend to head out to Butte to visit with the CES team and gain their sense of the support required that will place me in a better position to fashion or advise upon the correct capital structure.

The negotiations were relatively brief but nevertheless intense. Prior to the commencement of discussions Goldman advised that Montana had in fact received an unsolicited and topping bid over the weekend. Further, despite everybody's best efforts on due diligence there was some confusion over the company's latest balance sheet with respect to a notes payable in the amount of $10,750, 000. Previous advice from CES management was that the $10.7m was for their account. The CFO of the utility, however, thought otherwise. In any event, we did resolve it. BBI improved their bid from $82,500,000 to $84,500,000 and the company is responsible for the $10.7m. Milbank, acting for the Seller were pretty decent and 98% of our mark-up was accepted. I did take one break in the middle of it to let Don know how things were going and I have every confidence that the document will be looked upon favorably by equity investors.

Sam, I want you to know how very much I appreciate your personal support and advice in the weeks prior to our final bid and contract negotiations. As you know, I am not an M&A guy, I simply want to develop power projects and manage a company that does the same. I will call Joey late today or tomorrow to try and confirm an appointment with you for next week or the week after. Hopefully, I will be able to schedule the Butte trip by then. I look forward to seeing you again.

Warm regards,

Paul

Paul

FROM: MONTANA POWER COMPANY
      40 East Broadway
      Butte, Montana 59701

Contact: Cort Freeman
      406-497-2368
FAX:   406-497-2535
WEB: http://www.mtpower.com

September 20, 2000

## BBI Power Corporation To Buy Montana Power's Independent Power Unit

Stevensville (Maryland) -- Privately held BBI Power Corporation and The Montana Power Company (NYSE:MTP) announced today that BBI has agreed to acquire Montana Power's independent power business for $84.5 million in cash.

MPC's independent power unit invests in and operates co-generation and independent power plants through its subsidiary Continental Energy Services. Continental has interests in seven plants nationwide and in foreign countries, with its share totaling 494 megawatts of production and 500 megawatts in development. Closing of the transaction is expected to occur by year-end.

BBI said Montana Power's independent power unit matches its strategic plan for advancing its efforts in the emerging deregulated electricity market.

"We are buying a stable platform of electric production, future assets and employee talent to move us further into the deregulated electric market," said Paul Prager, BBI's president and chief executive. "As with all Montana Power companies, these guys know how to get the job done. Continental Energy Services is well positioned to provide sustainable growth and long-term profitability. We intend to grow our business through them, providing competitive electricity and plant management expertise to attractive niche markets."

Prager emphasized that BBI greatly values the skill, dedication and experience of the current management and employees of Continental Energy and looks forward to their joining BBI. "We will continue to employ all Continental employees. We will keep the company's headquarters in Butte, Montana and continue with the 500-megawatt, gas-fired, combined cycle power plant proposed for the Silicon Mountain Technology Park just west of the city."

Robert P. Gannon, Montana Power's chairman and chief executive said the divestiture of Montana Power's energy companies is right on track, meeting the company's goals of receiving good, solid values for oil and gas, coal and now independent power, and a promising future for employees. "Things are going very well, the future looks bright for our energy companies, and we wish the very best for everyone," he said, adding the company will continue moving quickly

to exit its energy businesses to create a clear vision and focus on Touch America, its telecommunications subsidiary.

BBI, headquartered in Stevensville, Maryland, is an infrastructure development company specializing in the early stage development of projects in power generation and water supply and wastewater treatment. The company was assisted in this transaction by the law firm of Kelley, Drye & Warren of New York. The company's current core operations are the international development of power projects.

The Montana Power Company is a diversified investor-owned electric and natural gas utility with nonregulated businesses in coal, oil and natural gas, and independent power production, and telecommunications. The company announced March 28, 2000 it would divest all of its energy businesses, including its utility, and invest the proceeds in telecommunications under Touch America. Montana Power on August 28 announced that PanCanadian Petroleum Limited of Calgary is buying its oil and gas properties, and on September 15, the company announced that Westmoreland Coal Company of Colorado Springs is buying its coal business. Touch America is a wholly-owned fiber-optic and wireless data transport telecommunications subsidiary of Montana Power, providing national long distance, private line, Internet, and business telephone equipment products and services. The company's digital fiber optic network, which will reach 26,000 route miles nationally by yearend 2001, employs the most advanced telecommunications technology available today. The company was assisted in this transaction by its financial advisor, Goldman, Sachs & Co. and the law firm of Milbank, Tweed, Hadley & McCloy, both of New York. Touch America and The Montana Power Company are based in Butte, Mont. Information about Montana Power can be found at http://www.mtpower.com.

###

Contacts:

BBI Corporation
Douglas Halliday
Chief Operating Officer
(410) 643-9500

Montana Power Company
Linda McGillen, Investor Relations
(406) 496-5211

# Exhibit G



E Q U I T Y   G R O U P   I N V E S T M E N T S ,   L. L. C.
TWO NORTH RIVERSIDE PLAZA • CHICAGO ILLINOIS 60606 • 312 454 1800

DONALD J. LIEBENTRITT
WRITER'S DIRECT DIAL NUMBER
(312) 466-3651

WRITER'S E-MAIL ADDRESS
dliebentritt@egii.com
WRITER'S DIRECT FAX NUMBER
(312) 575-7024

March 16, 2001

**BY FEDERAL EXPRESS**

Mr. Paul Prager
BBI Power Corporation
Manor House
208 Pier One Road
Stevensville, Maryland 21666

Dear Paul:

From my conversations this week with Chris Ryan and then you, it appears that BBI transferred its contract to purchase Continental Energy Services to CES Acquisition, a vehicle involving yourself (personally) and, as publicly reported, Evercore Capital Partners and Energy Spectrum Partners, in exchange for a continued interest in the deal and a commitment for the ongoing economic support of BBI's business. We obviously are interested in the details.

In addition to your promised investor update letter, copies of the underlying transaction documents would be appreciated.

Sincerely,

Donald J. Liebentritt

DJL/cm

cc:    Chris Ryan - by fedex

# Exhibit H



EQUITY GROUP INVESTMENTS, L.L.C.
TWO NORTH RIVERSIDE PLAZA • CHICAGO ILLINOIS 60606 • 312 454 1800

DONALD J. LIEBENTRITT
WRITER'S DIRECT DIAL NUMBER
(312) 466-3651

WRITER'S E-MAIL ADDRESS
dliebentritt@egii.com
WRITER'S DIRECT FAX NUMBER
(312) 575-7024

May 23, 2001

## BY TELECOPY (212) 857-3152

Christopher L. Ryan
Evercore Partners, Inc.
65 East 55th Street – 33rd Floor
New York, NY 10022

      Re:    BBI Power Corporation

Dear Chris:

To confirm our conversation last Friday, I would like to receive the following:

1.    All appropriate documentation for the investments made to date in BBI. This would include certificates for all outstanding preferred stock and warrants.

2.    Financial statements for BBI from inception to date.

3.    A complete set of the CES transaction documents.

Please let me know when I can expect to receive the above.

                Very truly yours,

                Donald J. Liebentritt

cc:    Sam Zell
        Bill Pate
        Jeff Klein

# Exhibit I

JUN 08 2001  8:31 AM FR EVERCORE PARTNERS INC8573152 TO 913125757024    P.03

# BBI POWER CORPORATION

| | |
|---|---|
| TO: | CHRISTOPHER RYAN |
| COMPANY: | EVERCORE PARTNERS INC. |
| FROM: | DOUGLAS HALLIDAY |
| SUBJECT: | BBI POWER CORPORATION – INQUIRY OF EQUITY GROUP INVESTMENTS |
| DATE: | 5/25/2001 |
| CC: | KIRKLAND & ELLIS (ATT: ANDREW LINDHOLM) |
| | EVERCORE CAPITAL PARTNERS (ATT: AUSTIN BEUTNER) |

I am responding to your e-mail conveying requests made on May 18 by Mr. Liebentritt, acting as attorney for Mr. Zell. As I understand it, his inquiries all related to BBI Power Corporation ("BBI")and its involvement in the recent acquisition of Continental Energy Services, Inc. by Evercore Partners Inc., Energy Spectrum Partners and their related affiliates. I will respond in the number order set forth in your e-mail.

1. BBI does not understand why Mr. Liebentritt is entitled to such information.

2. We will undertake to have original share certificates issued for the Series B and C investments and delivered to you. As Simpson Thacher & Bartlett drafted all documentation relating to these investments, I assume that Simpson Thacher, together with Evercore, can provide Mr. Liebentritt any documentation relating to the Series B and C investments (warrants and preferred) that he may lack.

3. We will prepare a report that details the financial status of BBI and deliver it to you for distribution to the Investors.

I trust the above is satisfactory.

Manor House, 208 Pier One Road, Stevensville, Maryland 21666
Phone: (410) 643 9500 Fax: (410) 643 9802

** TOTAL PAGE.03 **

Civil Cover Sheet

Page 1 of 1

*CAT 2*

DOCKETED

SEP 0 6 2001

JUDGE RONALD GUZMAN

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

MAGISTRATE JUDGE LEVIN **Civil Cover Sheet**

**01C 6909**

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s): SZ Investments, L.L.C., William Pate, Jeffrey Klein, Brian Boorstein, Rod Dammeyer, David Rosen, Jeffrey A. Wellek Revocable Trust**

County of Residence: Cook County, Illinois

Plaintiff's Atty:  David J. Bradford
Jenner & Block, LLC
One IBM Plaza, Chicago, IL 60611
(312) 222-9350

**Defendant(s): Paul Prager, BBI Power Corp., Roger Altman, Austin Beutner, John Birk, Michael Jordan, Curtis Lane, Neeraj Mital, David Pecker, Christopher Ryan, Paul Yovovich**

County of Residence: New York County, New York

Defendant's Atty:

FILED-EDS
01 SEP -5 PH 4:15
CLERK
U.S. DISTRICT COURT

II. Basis of Jurisdiction:          **3. Federal Question (U.S. not a party)**

III. Citizenship of Principle Parties
(Diversity Cases Only)

Plaintiff:- **N/A**

Defendant:- **N/A**

IV. Origin :                        **1. Original Proceeding**

V. Nature of Suit:                  **850 Securities / Commodities / Exchange**

VI. Cause of Action:                **15 U.S.C. sec. 78j(b). Cause of action for securities fraud in violation of Rule 10b-5.**

VII. Requested in Complaint

Class Action: **No**
Dollar Demand: **to be determined**
Jury Demand: **Yes**

VIII. This case **Is NOT** a refiling of a previously dismissed case. (If yes case number ___ by Judge ___)

Signature:

Date: *8/24/01*

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size in your browser display to make the form print properly.**          Revised: 06/28/00

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

JUDGE RONALD GUZMAN

In the Matter of

SZ Investments, L.L.C., et al

MAGISTRATE JUDGE LEVIN

vs.

Case Number:

Paul Prager, et al

**01C 6909**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR: Plaintiffs

DOCKETED

SEP 0 6 2001

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME David J. Bradford | NAME Benjamin C. Weinberg |
| FIRM Jenner & Block | FIRM Jenner & Block |
| STREET ADDRESS One IBM Plaza | STREET ADDRESS One IBM Plaza |
| CITY/STATE/ZIP Chicago, Illinois 60611 | CITY/STATE/ZIP Chicago, Illinois 60611 |
| TELEPHONE NUMBER (312) 222-9350    FAX NUMBER (312) 840-7375 | TELEPHONE NUMBER (312) 222-9350    FAX NUMBER (312) 840-7654 |
| E-MAIL ADDRESS djbradford@jenner.com | E-MAIL ADDRESS bweinberg@jenner.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 00272094 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06204701 |
| MEMBER OF TRIAL BAR?    YES ☑  NO ☐ | MEMBER OF TRIAL BAR?    YES ☐  NO ☑ |
| TRIAL ATTORNEY?    YES ☑  NO ☐ | TRIAL ATTORNEY?    YES ☑  NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL?    YES ☐  NO ☑ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Erin R. Schrantz | NAME |
| FIRM Jenner & Block | FIRM |
| STREET ADDRESS One IBM Plaza | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, Illinois 60611 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (312) 222-9350    FAX NUMBER (312) 840-8774 | TELEPHONE NUMBER    FAX NUMBER |
| E-MAIL ADDRESS eschrantz@jenner.com | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6273562 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?    YES ☐  NO ☑ | MEMBER OF TRIAL BAR?    YES ☐  NO ☐ |
| TRIAL ATTORNEY?    YES ☑  NO ☐ | TRIAL ATTORNEY?    YES ☐  NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?    YES ☐  NO ☑ | DESIGNATED AS LOCAL COUNSEL?    YES ☐  NO ☐ |